THE HONORABLE JOHN C. COUGHENOUR

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

GEORGE ALVAREZ, et al.

Plaintiffs,

v.

KING COUNTY, d/b/a KING COUNTY
SHERIFF'S OFFICE, et al.

Defendants.
_____

BARRON BALDWIN,

Plaintiff

v.

KING COUNTY, d/b/a KING COUNTY
SHERIFF'S OFFICE, et al.

Defendants.

NO.  C06-0023-JCC

**PLAINTIFFS' MOTION FOR
RECONSIDERATION OF
ORDER GRANTING
SUMMARY JUDGMENT**

**Noted for
June 22, 2007**

Plaintiffs Jim Keller, George Alvarez and Barron Baldwin respectfully submit this Motion for Reconsideration of the Court's Order Granting Summary Judgment (Dkt. No. 228).

**I.      Plaintiffs Have Raised Numerous Issues of Material Fact as to Probable Cause in this Civil Case**

a.      Probable Cause Is Evaluated Based on the Information Possessed by the Decision-Making Parties at the Time of the Arrest Decision

"Probable cause exists when, at the time of arrest, the agents know reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense." *United States v. Velasquez*, 856 F.2d 1292 (9th Cir. 1988). In the present case, the individual defendants were responsible for the investigation and decision to arrest Plaintiffs.  As none of these individuals were present for the events of October 22, 2003, the relevant inquiry is whether, at the time of the arrest decision, their investigation had

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 1

LAW OFFICES OF
JUDITH A. LONNQUIST, P.S.
1218 THIRD AVENUE, SUITE 1500
SEATTLE, WA 98101-3021
TEL 206.622.2086   FAX 206.233.9165

yielded sufficient "reasonably trustworthy" information to lead them to believe that Plaintiffs had committed assault and unlawful imprisonment.[1]

In a civil case, the "reasonableness" of a probable cause determination is dependent upon the underlying facts and thus is a question for the jury. Accordingly, summary judgment is inappropriate unless no reasonable jury could find an absence of probable cause. *McKenzie v. Lamb*, 738 F.2d 1005, 1007-1008 (9th Cir. 1984); *Accord, Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994). Because Plaintiffs have established numerous issues of fact as to the sufficiency and trustworthiness of the information upon which Defendants based their arrest decision, the existence of probable cause and the related abuse of process and malicious prosecution claims, are issues of fact for trial.

b.      The Wheeler and Celis Statements Raise Numerous Issues of Fact for the Jury

It is undisputed that Defendants did not interview alleged victim Michael Winchester or Plaintiffs prior to their arrests.  They relied instead on the October 24, 2003 statements by Ben Wheeler and Vic Celis. Following are some of the more significant issues of material fact related to the issue of probable cause, contained solely within the Celis and Wheeler Interviews, which are in many respects inherently inconsistent:

| Statement of Vic Celis 10/24/2003 at 1909 hours | Statement of Ben Wheeler 10/24/2003 at 2152 hours |
| --- | --- |
| Alvarez, Baldwin and Wheeler picked up Winchester in the Bronco. (Dkt. 158-2 at 5). | Wheeler drove Celis and Keller separately while Alvarez and Baldwin picked up Winchester. (Dkt. 158-3 at 8). |
| Celis did not smell pepper or see stream of spray; did not know if he saw a canister.  "Just kind of put it together that that's what happened" when Winchester said | No mention of pepper spray until asked: Wheeler did not see it, smell pepper or hear anyone say anything about pepper. He did not see orange spray on Winchester's |

[1] If, as the Court suggests in its Order, (Docket No. 228 at 4), events beyond those contemporaneously known to Defendants are relevant to probable cause, such would only create further issues of fact. To provide a few examples: in the criminal trial, Winchester admitted that he used methamphetamine almost daily and that he made up stories about the officers because Weiland and Toner were looking for information that the officers assaulted him. (Ex. 1 at 74, 109). Wheeler testified that on October 22, 2003, the officers were concerned about an ambush, as they were meeting a known criminal at a known place and time, and there was a $10,000 per officer hit out on Plaintiffs. (Ex. 2 at 127-28). He stated that Celis's view at Sportsworld was obstructed and was adamant that Plaintiffs committed no crime. (Ex. 2 at 129, Ex. 3 at 3, 21). No injury or use of force occurred to necessitate filing a report. (Ex.2 at 181-182). *All Exhibits cited herein are exhibits to the Declaration of Reba Weiss.*

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 2

LAW OFFICES OF
JUDITH A. LONNQUIST, P.S.
1218 THIRD AVENUE, SUITE 1500
SEATTLE, WA 98101-3021
TEL 206.622.2086   FAX 206.233.9165

| | |
|---|---|
| something about his eyes. (Dkt. 158-2 at 10-11). | face or hear him say anything about burning. Winchester's eyes were watering and he was holding his face. (Dkt. 158-3 at 25-26, 28). |
| Keller did not hit Winchester (Dkt. 158-2 at 12, 14) | Keller, Baldwin and Alvarez all hit Winchester, but Wheeler cannot provide clear specifics regarding each alleged contact. (Dkt. 158-3 at 9-10).[2] |
| Baldwin and Alvarez slapped him. (Dkt. 158-2 at 12). | Only Baldwin slapped Winchester. (Dkt. 158-3 at 27). |
| No punches to the head, just some slaps to the top or side of the head. (Dkt. 158-2 at 11-13). | Winchester was punched twice in the body and once in the head. (Dkt. 158-3 at 10). |
| Describes closed-fist strikes as "thrusts" or "contact punches" and the entire event as "an annoyance" not an attack. (Dkt. 158-2 at 11-12). Would not have bruised him or left a mark. (Dkt. 158-2 at 12-13) | It is hard to say to say what Winchester thought because "he is a good actor." Nobody said they were going to kill him, and Keller and Alvarez did not appear serious in any threats against him. (Dkt. 158-3 at 20, 16-17) |
| Celis was getting out of the car and missed the start of the events at Sportsworld. (Dkt. 158-2 at 9). | Wheeler may have missed some aggressive action by Winchester in the Bronco. (Dkt. 158-3 at 10). |
| At Sportsworld, Celis told Winchester to stand up and be quiet. Winchester did so, and there were no further strikes. (Dkt. 158-2 at 13). | Wheeler and Celis did not involve themselves at Sportsworld. They backed off and did not intervene. (Dkt. 158-3 at 10-11, 16, 18). |
| Celis and Keller left Sportsworld for the river ahead of the Bronco. (Dkt. 158-2 at 14-15, 26). | Wheeler and Alvarez got into the back of the two-door Bronco, then Winchester "just simply got in" on his own. (Dkt. 158-3 at 14). |
| Baldwin and Alvarez were holding Winchester's arms at the river. Celis does not remember who held what arm. (Dkt. 158-2 at 17). | Winchester was physically escorted by Baldwin at the river. Doesn't know if anyone else had his other arm. (Dkt. 158-3 at 21) |
| Someone told Winchester to take off his shoes, but he did not do so. (Dkt. 158-2 16). | When asked whether anybody took Winchester's shoes, Wheeler stated that at some point he noticed Winchester had no shoes and was in his socks. (Dkt. 158-3 at 20). |
| Wheeler remained at the back of the Bronco near the street throughout the events at the river. He did not interject himself into the situation or appear to say anything. (Dkt. 158-2 at 18). | At the river, Wheeler "physically walked in front of Plaintiffs and stopped them," telling Winchester he should talk rather than be thrown in the river. Winchester then complied (Dkt. 158-3 at 19). |
| Celis went out for beers with Alvarez at the end of the night, and Alvarez said he had not been able to bring himself to hit Winchester.  (Dkt. 158-2 at 21). | Winchester was aware of his warrant and that he would be arrested if he did not agree to the officers' terms. (Dkt. 158-3 at 29). |

Wheeler's and Celis's statements, including those set forth above, raise critical issues of fact regarding probable cause. Neither Wheeler nor Celis was able to clearly see or smell any pepper spray. Defendants, then, could not have credited the testimony that pepper spray was used or that its use was unprovoked.[3] Likewise, Defendants did not have credible testimony regarding any further alleged crime against Winchester sufficient to meet the *Velasquez* standard.  The conflicting testimony regarding critical events, such as the nature, level of force, and perpetrators

---

[2] Wheeler acknowledges the contacts were not consecutive, and he provides no reason for his inability to recall key details such as who made the initial contact. (Dkt. 158-3 at 11).

[3] Since Celis unequivocally stated that Keller was not involved in any other assault, his arrest was clearly without probable cause.  Keller's innocence of any assault was affirmed by the criminal jury's not guilty verdict.

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 3

LAW OFFICES OF
JUDITH A. LONNQUIST, P.S.
1218 THIRD AVENUE, SUITE 1500
SEATTLE, WA 98101-3021
TEL 206.622.2086   FAX 206.233.9165

of any physical contact, creates disputes of material fact regarding the existence of probable cause which can only be determined by a jury.

In addition to the questions of fact raised by the substance of the Celis and Wheeler statements, the statements both raise significant credibility issues that render them insufficient to meet the trustworthiness prong of the *Velasquez* probable cause standard.   Wheeler showed himself willing to testify about anything Toner suggested to him, providing questionable prompted testimony regarding the pepper spray[4] and Winchester's shoes.[5]   Both Celis and Wheeler demonstrated a fear of being implicated that appeared to compromise their testimony. Celis testified he was alone with Keller when Wheeler, Alvarez, and Baldwin went to pick up Winchester. Wheeler alleged he was with Celis throughout that period.[6] Even more problematic, both officers claimed to have intervened at various stages in defense of Winchester, but neither confirmed the other's involvement.[7] Further, the witnesses met and discussed the events prior to providing their statements, which should have raised concerns that they may have attempted to coordinate their stories. (Dkt. 158-2 at 22; Dkt. 158-3 at  24-25).

In his expert report, Dr. Robert Keppel discussed the significance of the Wheeler/Celis contradictions, finding that they warranted further investigation before a finding of probable

---

[4] In his criminal trial testimony, Wheeler testified that he never saw pepper spray, but assumed it was used based on all of the questions about it. (Ex. 2 at 133)

[5] Winchester ultimately confirmed that, in contrast to Wheeler's assertions, his shoes never came off. (Ex. 10 at 17). In his expert report, Dr. Robert Keppel notes, "Toner thought the claim that Winchester's shoes were removed was important enough to include it in his Statement of Probable Cause.  He later crossed it out." (Ex. 4 at 11)(Keppel's report is dated 6/9/07 and was not available at the time Defendants' Motion for Summary Judgment was pending).

[6] Dr. Keppel states that "[t]his discrepancy is significant for a number of reasons.  First, it is highly unlikely that Wheeler, who claims he was <u>driving</u> Keller's Toyota, was simply confused and thought he was driving a Toyota rather than riding as a passenger in a Bronco.  Second, the incident had occurred less than 48 hours prior to Toner's interview.  It is unlikely that these trained police officers had forgotten which vehicle they were in.  Third, both Celis and Wheeler claim that Winchester was picked up in the Bronco.  Both had a motive not to be in the vehicle that picked up Winchester, and therefore had a motive to be untruthful." (Ex. 4 at 8).

[7] If they did not intervene, each fabricated at least a portion of his testimony. If they did, the other witness's perception was obviously in some way impaired.  In a police case such as this, which necessarily involves a rigorous balancing to determine whether force was arguably reasonable, even slight perceptive problems are critical, and either weakness defeats probable cause.

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 4

LAW OFFICES OF
JUDITH A. LONNQUIST, P.S.
1218 THIRD AVENUE, SUITE 1500
SEATTLE, WA 98101-3021
TEL 206.622.2086   FAX 206.233.9165

cause could be made. Dr. Keppel stated that "since the truth on these matters is unknown and too much unreliable information existed, more investigation was necessary before a disinterested police officer could establish probable cause for the arrest of Alvarez and Keller."[8] (Ex. 4 at 11).

     c.     Probable Cause Is Evaluated Based on the Totality of the Circumstances, Which Here Raise Further Questions of Fact Regarding Probable Cause

In evaluating the existence of probable cause, courts look at the *totality of the circumstances* known to the arresting officials at the time of their decision. *See United States v. Ruiz*, 918 F.2d 821, 825 (9th Cir. 1990). Looking beyond the face of the Celis and Wheeler statements at the totality of circumstances known to Defendants at the time of Plaintiffs' arrests raises additional issues of fact related to probable cause.

     i.     Plaintiffs Were Police Officers Acting in the Course of their Duties

Supreme Court precedent is clear that standards of force for police officers are unique because "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Muehler v. Mena*, 544 U.S. 93, 98 (2005).[9]  Accordingly, an inquiry into the reasonableness of an officer's use of force must consider such factors as the severity of the suspect's crime and whether he poses a threat to officer safety, is resisting, or is attempting to evade arrest by flight. *Id*. at 397.   The *Graham* Court recognized that "[t]he calculus of

---

[8] Keppel also stated that probable cause could not be premised on the information obtained from Toner's biased and incomplete investigation. (Ex. 4 at 15).

[9] In discussing qualified immunity, the Ninth Circuit in *Beier v. City of Lewiston*, 354 F.3d 1058, 1071 (9th Cir. 2003), explained the justification behind the double-standard with respect to police officer force:

> Without some room to make mistaken but reasonable decisions, the fear of making an unforeseeable error and thereby incurring liability could dissuade public officials from pursuing their duties with vigor. Police officers charged with protecting public safety, for example, could become bystanders rather than law enforcers whenever faced with any but the most clear circumstances implicating constitutional rights. "The concept of immunity . . . assumes that it is better to risk some error and possible injury from such error than not to decide or act at all."

*(quoting Scheuer v. Rhodes*, 416 U.S. 232, 242, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)).

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 5

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham* 490 U.S. at 397.

Wheeler and Celis's statements make clear that Plaintiffs had reasonable concerns regarding officer safety during the Winchester contact. Winchester was a known felon who had evaded the officers for days.[10] He also had connections to the Fesili case, which involved credible threats against the officers' lives.[11] Further, Winchester was a known methamphetamine user, and KCSO officers receive training providing that methamphetamine causes extreme paranoia, makes people believe they can do super-human things, and boosts their physical abilities. (Ex. 2 at 73, 82). Addicts are unpredictable, and an outstanding warrant makes them even moreso. (*Id.* at 135-136). If Winchester had merely grabbed at an officer's arm, the use of pepper spray and a stunning blow would have been appropriate. (*Id.*) Adding to all these concerns, the area in which Plaintiffs were working was a hotbed of criminal activity, where gangs were bold and gaining force. (*Id.* 57-58, 161).

ii.  Wheeler and Celis's Failure to Intervene and KCSO Practice Suggest That Further Investigation Was Needed In Order to Establish Probable Cause

A police officer has an affirmative duty to prevent the unlawful exertion of force by a fellow officer where he has knowledge and the opportunity to intervene. *Byrd v. Brishke,* 466 F.2d 6, 9 (7th Cir. 1972) (stating that "to hold otherwise would be to insulate officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace"); see also *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).

---

[10] Winchester had a valid felony warrant.  He had evaded the officers for days and had only called because they "ruined" every place he had to stay by looking for him. (Dkt. 158-3 at 7, 28-29).

[11] At the end of the night, Winchester was dropped off at the home of a woman who was involved in the Fesili case. (Dkt. 158-2 at 20, 27). With respect to the force the officers used, Celis linked it to the Fesili threats, saying he felt the officers believed "the only other way to keep people from shooting at 'em or trying to kill 'em *because there are people out there that want to kill those guys*, is to, you know, come at 'em strong and, and be forceful." (*Id.* at 29).

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 6

LAW OFFICES OF
JUDITH A. LONNQUIST, P.S.
1218 THIRD AVENUE, SUITE 1500
SEATTLE, WA 98101-3021
TEL 206.622.2086   FAX 206.233.9165

Defendants were aware that Wheeler and Celis, who had the most available information regarding the relevant events, had failed not only to arrest Plaintiffs but also to intervene to prevent Plaintiffs' actions, creating substantial doubt as to whether a crime was in fact committed. Likewise, although Celis and Wheeler described Plaintiffs' conduct as "too much," neither stated that it was criminal.[12] (Dkt. 158-2 at 23). Further, both witnesses stated that historically Plaintiffs had always behaved appropriately and within KCSO policy in their uses of force, suggesting that they may have missed relevant exculpatory details in this instance. (*Id*.; Dkt. 158-3 at 31).[13]

Defendants' history of dealing with excessive force allegations is also relevant to the totality of the circumstances analysis here. Wheeler was not arrested when Winchester alleged that he was involved in two instances of threats and abuse, including holding a gun to Winchester's head on October 22, 2003.[14] Likewise, in no other instance have Defendants ever arrested an officer for on-duty use of force prior to a thorough investigation.[15]

## II.      The Individual Defendants Are Not Entitled to Qualified Immunity[16]

An official is not entitled to qualified immunity if, in the light most favorable to the individual asserting the injury, the facts demonstrate that the defendant officer violated a clearly established constitutional right. *Beier v. City of Lewiston*, 354 F.3d. 1058, 1065 (9th Cir. 2003). The failure to investigate and acquire available, relevant information is objectively unreasonable

---

[12] Wheeler indicated that he was not concerned about how Plaintiffs would respond to his involvement in the investigation against them, which does not suggest that Plaintiffs were rogue, criminal cops. (Dkt. 158-3 at 31).

[13] Celis stated "I haven't seen anything illegal. I've never seen anybody heavy hand anybody as far as somebody who is there who didn't have any reason to be grabbed onto, put on the ground or anything like that. Every time I seen em do something like that it's in my mind in a justified situation to do that."( Dkt. 158-2 at 23).

[14] On the contrary, Wheeler was given another chance to tell his story in a Garrity interview. He was given the opportunity to reconcile numerous contradictions in the testimony and to deny Winchester's assault allegations against him. (Ex. 5). The fact that Defendants felt they needed specifically address these contradictions (such as the cars and the alleged intervention) itself raises issues of fact regarding probable cause.

[15] This practice reflects the ambiguities of the use of force in police work, as discussed above.

[16] Of course, no such defense is available to defendant KCSO.

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 7

and precludes qualified immunity. *Id.* at 1072. Since Plaintiffs have raised issues of fact suggesting that Defendants violated their well-established Fourth Amendment rights by failing to conduct adequate investigation prior to their arrest, summary judgment is not appropriate.

**III.   King County Is Liable for Defendant Rahr's Retaliatory Acts Against Plaintiffs Keller and Alvarez, as Rahr Was Acting as a "Final Policy-Maker."**

In the Court's Order on Defendants' Motion for Summary Judgment, the Court held that "Plaintiffs have failed to allege any unconstitutional policy with respect to this retaliation claim either in their complaint or in their opposition." Dkt. 228 at p. 14. But Plaintiffs had argued that King County was liable for Sheriff Rahr's acts as Rahr was a "final policy-maker." See Plaintiffs' Response to Defendants' Motion for Summary Judgment, Dkt. 181, at pp. 16-17. In determining whether an individual has final policy-making authority, the Court looks at whether the individual has authority "in a particular area, or on a particular issue." *McMillan v. Monroe County*, 520 U.S. 781, 785 (1997). "A municipality may be liable for an isolated constitutional violation when the person causing the violation has final policy-making authority." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

In the present case, it was Sheriff Rahr who made the decision that Plaintiff Keller would not receive a promotion to FTO.   Sheriff Rahr certainly had final policy-making authority with regard to this decision to not promote Plaintiff Keller because of his lawsuit.  As the elected sheriff of King County and the "chief executive officer" of that office (see RCW 36.28.010), Sheriff Rahr was acting as final policy-maker on behalf of King County when making employment decisions relating to plaintiffs Keller's and Alvarez's promotion requests. Accordingly, King County is liable for Sheriff Rahr's decisions in that regard.

The Court, in granting Defendants' Motion for Summary Judgment on Plaintiff Alvarez's First Amendment retaliation claim, noted that the lawsuit in the present case was filed on May

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 8

20, 2005, which was after Plaintiff Alvarez had been denied a transfer to the bicycle unit and a transfer to the TAC-30 team. Dkt.228, at p. 15-16. However, prior to the filing of the lawsuit, Plaintiff Alvarez had submitted a Claim for Damages to the county, which was received by the County on February 7, 2005. *See* Alvarez Claim for Damages and return receipt dated February 7, 2005, Dkt. 180, and Ex. 6. In his Claim for Damages, Alvarez identified Defendants Rahr and Toner as witnesses to matters alleged in the claim. Plaintiff Alvarez's submission of a Claim for Damages against Defendant King County, in which he alleged "false and wrongful detention, arrest and jailing, wrongful prosecution, violation of civil rights, wrongful demotion in employment, defamation" is certainly entitled to the same First Amendment protection as the actual filing of a lawsuit. The submission of the Claim for Damages is a prerequisite to individuals bringing claim under Washington State law against a county. *See* RCW 4.96.020, requiring the submission of such claim and prohibiting the commencement of any action until 60 days have elapsed after the claim has been presented to the governing body of the county. Alvarez's request to be transferred to the TAC-30 unit was denied on February 22, 2005, only two weeks after the County received his claim for damages. (TAC-30 Application for Transfer, Docket No. 182-4, Exhibit 18 to Weiss Declaration). The temporal proximity of the filing of Alvarez's claim for damages and the alleged retaliation creates, at the very least, genuine issues of material fact as to whether Defendants Rahr and King County retaliated against Plaintiff Alvarez for submitting a claim for damages against King County.

**IV.   There Are Issues Of Material Fact Regarding Plaintiff's Defamation Claims That Preclude Summary Judgment**

The Court states that "[i]t is undisputed that [Somers] shortly thereafter retracted that statement when questioned about it by Turney-Loos." Dkt. 228, p. 19. This statement overlooks evidence, which is undisputed by Defendants, that

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 9

LAW OFFICES OF
JUDITH A. LONNQUIST, P.S.
1218 THIRD AVENUE, SUITE 1500
SEATTLE, WA 98101-3021
TEL 206.622.2086   FAX 206.233.9165

> Somers repeatedly said Keller and Alvarez were guilty, especially in front of the young troops. He would say, "I love these kids like they were my own kids …" dramatically, for the benefit of the inexperienced officers, before he would say anything derogatory about them.   Dkt. 192 at 20.

Therefore, even assuming that Somers did retract his statement to Turney-Loos, it is undisputed that Somers made repeated statements to others, <u>that he did not retract</u>, that Plaintiffs "were guilty".   Furthermore, Defendants presented no evidence that Defendant Rahr retracted her statements that Plaintiffs were "dirty cops".

Actual malice is knowledge that the statement was false <u>or made with reckless disregard for the truth</u>. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  Actual malice may be proved by inference, as it would be rare for a defendant to admit to actual malice.

> A court typically will infer actual malice from objective facts. These facts should provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice.

*Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1085 (9th Cir. 2002)(citations omitted).  In a summary judgment motion, all inferences are to be drawn in favor of Plaintiffs.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)(citations omitted).

It is not disputed that Somers repeatedly told the "young troops" that Plaintiffs "were guilty".  Since Plaintiffs were never convicted of any crime, and are presumed innocent until proven guilty, Somers knew at the times he made such statements, that they were false.  As a commander with a police department, these repeated and un-retracted statements certainly raise a genuine issue of material fact as to actual malice.  A jury could infer that Rahr had actual malice when, as KCSO Chief, she called Plaintiffs "dirty cops" and questioned whether they were "salvageable".

Finally, the common interest privilege does not apply here since Somers violated KCSO policies, considered a "serious breach of ethics" and a possible violation of state law, by

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 10

providing details of an open investigation to those who had no right to know such details[17]:

> Q. (Weiss)  But isn't it true that at those meetings on Sunday and on Monday you shared a great many more details than what's contained on Exhibit No. 9 on the SIR about the actual allegations against these officers?
> MR. CORKRUM: Objection; form.
> A. (Somers)  I probably did.

(Ex. 7).   Plaintiffs' defamation claims against Defendants Somers and Rahr should therefore survive summary judgment.

## V.        Plaintiffs Have Presented Sufficient Evidence to Create Genuine Issues of Material Fact Regarding Their Emotional Distress Claims.

The Court, in granting Defendants' Motion on Plaintiffs' outrage and negligent infliction of emotional distress ("NIED") claims, ruled that Plaintiffs "never explained how these statements to individuals other than Plaintiffs could have possibly caused Plaintiffs emotional distress."   (Dkt. 228, at 22).   Plaintiffs respectfully believe that the Court has misperceived Plaintiffs' argument.   Plaintiffs do not argue that those statements caused Plaintiffs emotional distress – Plaintiffs argue that Defendants' actions in arresting and jailing Plaintiffs, when even Defendants admit there was no reason to do so, are the bases for the outrage and NIED claims.

Defendant Scott Somers, when asked why they went forward with the plan to arrest Plaintiffs even though they knew Winchester was safe, replied: "Why not?"  Ex. 7 at 229-232. Mark Toner, when asked why he thought it was necessary to book Plaintiffs into the King County Jail and hold them for 72 hours, replied "I don't know that it was."  Ex. 8 at 146.  On the night of the arrests, Defendant Rahr called Officer Steve Eggert, President of King County Police Officers Guild, and told him that "she was afraid Jim and George 'would want to kill themselves after being arrested' and they needed to be 'watched'. Dkt. 187, ¶5.  These facts certainly give

---

[17] "Release of information to unauthorized personnel is a serious breach of ethics and can be a violation of state law. Release of information regarding an investigation shall be only to those who have a right and need to know, and will be released by the IIU commander." Ex. 11, KCSO General Orders Manual, 3.01.080.

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 11

LAW OFFICES OF
JUDITH A. LONNQUIST, P.S.
1218 THIRD AVENUE, SUITE 1500
SEATTLE, WA 98101-3021
TEL 206.622.2086   FAX 206.233.9165

rise to questions regarding Plaintiffs' emotional distress claims that should be decided by a jury, Grimsby v. Samson, 85 Wn.2d 52, 59-60, 530 P.2d 291 (1975), particularly in view of the prior outstanding record of Plaintiffs' performances as deputies in the King County Sheriff's Office.

Plaintiff Jim Keller has objective medical evidence of the emotional distress that was not available at the time that Plaintiffs presented their response to Defendants' Motion for Summary Judgment. Attached hereto is the psychiatric report on Plaintiff James Keller by John A. Liebert, M.D. (Ex. 9). Dr. Liebert describes the anxiety and insomnia experienced by Keller as a result of Defendants' acts. Dr. Liebert has diagnosed Plaintiff Keller with Post Traumatic Stress Disorder. This is clearly sufficient objective medical evidence regarding Plaintiff Keller's damages to withstand summary judgment. Accordingly, the Court should deny Defendants' Motion for Summary Judgment on Plaintiffs' emotional distress claims.

### CONCLUSION

For the foregoing reasons, we respectfully request that the Court reconsider its summary judgment ruling and deny Defendants' motion in its entirety.

Respectfully submitted, this 22nd day of June, 2007.

THE LAW OFFICES OF JUDITH A. LONNQUIST, P.S.


/s/  Reba Weiss_____
REBA WEISS
Attorneys for Plaintiffs Alvarez and Keller

LAW OFFICES OF ROBERT D. BUTLER


/s/ Robert Butler_____
ROBERT D. BUTLER
Attorney for Plaintiff Baldwin

PLAINTIFFS' MOTION FOR
RECONSIDERATION OF ORDER
GRANTING SUMMARY JUDGMENT
[C06-0023 JCC] – Page 12

LAW OFFICES OF
JUDITH A. LONNQUIST, P.S.
1218 THIRD AVENUE, SUITE 1500
SEATTLE, WA 98101-3021
TEL 206.622.2086   FAX 206.233.9165

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2007, I caused to be electronically filed the foregoing documents with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:


Lee Corkrum   lcorkrum@omwlaw.com
Robert Butler

                                        LAW OFFICES OF
                                        JUDITH A. LONNQUIST, P.S.


                                        /s/ Reba Weiss_____
                                        Reba Weiss

CERTIFICATE OF SERVICE
 [C06-0023-JCC]